UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| TIA CLARK | |
| and | |
| EBONI GOVAN | |
| PLAINTIFFS, | |
| v. | CIVIL ACTION NO. |
| DISTRICT OF COLUMBIA , | |
| DEFENDANT. | |

**FIRST AMENDED COMPLAINT**

COME NOW the Plaintiffs, Tia Clark and Eboni Govan, by and through their undersigned attorneys, and sue the District of Columbia, and for their causes of action, Plaintiffs declare and aver as follows:

**I. Preliminary Statement.**

This is an action under the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000e-16 *et seq.*, as amended, for compensatory damages as well as equitable relief against Defendant, District of Columbia growing out of Defendant's discriminatory and retaliatory treatment of Plaintiffs on the basis of their race (Black). This is action also seeks relief for Intentional Infliction of Emotional Distress.

## II. Jurisdiction.

1. This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f) *et seq.*, as amended by the Civil Rights Acts of 1966, 1972, and 1991, 42 U.S.C. § 1981a (hereinafter "Title VII").

2. On October 6, 2005, the United States Department of Justice issued Ms. Clark a Right to Sue Letter for her Charge of Discrimination, Charge Number 100-2005-00664, received by Ms. Clark on October 12, 2005. This suit is filed within the prescribed time period.

3. On November 23, 2005, the United States Department of Justice issued Ms. Govan a Right to Sue Letter for her Charge of Discrimination, Charge Number 100-2005-00670, received by Ms. Govan on November 29, 2005. This suit is filed within the prescribed time period.

4. This Court has jurisdiction over Plaintiffs' pendent common law claim of Intentional Infliction of Emotional Distress pursuant to 28 U.S.C §§ 1343(a)(4) and 1367(a).

5. Plaintiffs have satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## III. Venue.

6. The venue of this action is properly placed in the United States District Court for the District of Columbia pursuant to 29 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Plaintiffs' claims arise in this district, where the Defendant Williams maintains his offices and his personnel files and because the tortious acts alleged herein occurred in the District of Columbia.

### IV. Parties.

7. Plaintiff Tia Clark is an African-American female and is an employee within the meaning of Title VII.

8. Plaintiff Eboni Govan is an African-American female and is an employee within the meaning of Title VII.

9. Defendant District of Columbia is a municipal corporations. It is comprised of numerous offices including the Office of the Attorney General and is responsible for the policies and practices which are the subject of this litigation. Defendant employs more than 500 persons and is an employer within the meaning of Title VII.

### V. Statement of Facts.

10. In October of 2001, Plaintiff Clark accepted a position with the District of Columbia government in the office of the Corporation Counsel, Office of the Attorney General (formerly known as the Office of the Corporation Counsel), as a paralegal in the Family Services Division. In July of 2003, she received a 13 month term appointment as an attorney in the Legal Service Section of the Child Support Services Division within the Office of the Attorney General.

11. Ms. Clark performed excellent work as a paralegal and then as an attorney for the Section. During her first three years, she received continuous praise for the work that she was performing. Ms. Clark took great pride in her work.

12. In March of 2002, Plaintiff Govan accepted a position as an attorney in the Legal Services Section of the Child Support Services Division within the Office of the Attorney General as a 13-month term employee.

13. From 2002 to 2004, Ms. Govan consistently received high rating for her work and was routinely recognized for her contributions to the Child Support Division.

14. On or about July 2, 2004, Kristin Henrikson, a white female, became the new Chief of the Legal Services Section of the Child Support Service Division.

15. Shortly after Henrikson's arrival, she commenced a pattern of discriminatory and harassing behavior against the Plaintiffs and the other African-American attorneys within the Division, creating a racially hostile work environment.

16. By way of example, almost immediately after her arrival, Henrikson began to monitor the arrival times of the African-American attorneys in the office. If an African-American attorney arrived even a few minutes late, she would make a note on the office log-in sheet. However, when a White attorney arrived late, she made no notation. Ms. Govan was repeatedly reprimanded by Henrikson, both verbally and through electronic mail, about her punctuality and even threatened with further sanctions even though White attorneys who arrived late were not admonished.

17. Henrikson also routinely allowed the White attorneys to take care of personal business during the working day without requiring that they submit a leave slip. Instead, she simply allowed them to make up the time at the end of the day or not at all. In contrast, African-American employees were not permitted to take care of personal business during the working day unless they submitted a leave slip.

18.     Henrikson also routinely walked by the offices of African-American attorneys to monitor their work habits but did not do so for White attorneys.

19.     Henrikson assigned African-American attorneys to more demanding court calenders and assigned White attorneys to less demanding calenders.

20.     Henrikson provided African-American attorneys with little or no assistance managing their calendars whereas White attorneys were almost always provided assistance.

21.     Henrikson assigned African-American Attorneys to consecutive days in Court, leaving no time to complete administrative and office tasks. Conversely, White attorneys were always given office days to complete administrative and office tasks.

22.     When White attorneys needed to be relieved from going to court because of some medical issues involving themselves or family members, Henrikson readily granted their requests. But when an African-American attorney needed such an accommodation, Henrikson almost always refused their requests.

23.     Plaintiff Govan suffers from Lupus and Fibromylagia which causes her to become fatigued and to experience joint pain. As a result, she asked Henrikson that she not be assigned to the court calendar on consecutive days because the stress of the calendar aggravated her conditions as well as modest flexibility with her arrival time. Even though other personnel were available to share this responsibility, the Defendant refused her request. Later in the same day on which Govan made her request, apparently in response to this request, Henrikson revoked her prior approval of make-up time for Govan, without warning or reason.

24. Defendant never agreed to make any permanent accommodation. Instead, Henrikson agreed to temporarily try to avoid assigning Plaintiff to consecutive days in court. Moreover, Henrikson continued to question and harass Govan about her time and attendance.

25. On or about May 9, 2005, five months after Govan requested accommodation, Defendant transferred Govan to the Policy and Procedures Section in the Child Support Services Division even though Govan had limited knowledge and or experience in this area. Henrikson suggested to Govan that her conditions might be accommodated there. However, though Satterfield intended for Plaintiff's transfer to be immediate, Henrikson delayed the transfer by one month in order to train Plaintiff's replacement. There were other staff available to train those new employees.

26. During the month preceding Govan's transfer, Henrikson continued to place Govan on the most demanding court calendars and assigned her extra work and consistently reprimanded her for arriving late to work. As a result of the increased workload and stress that Govan experienced as a result of Henrikson's conduct, on May 13, 2005, Plaintiff suffered a stress attack, with extreme dizziness, numbness and tingling in her legs, and loss of blood pressure. This led to Plaintiff fainting in the courtroom causing her to be hospitalized and then placed on bedrest for five days thereafter.

27. Henrikson required that Plaintiff submit a leave slip for the two hours remaining in the workday when Plaintiff went to the hospital.

28. In July 2004, Plaintiff Clark agreed to serve in a temporary assignment to the Domestic Violence Calender during the extended leave of two White attorneys. The Domestic Violence Calender is a demanding calender because of the number of court rooms and cases that

an attorney is required to manage. As a result, it was generally staffed with at least two attorneys and a case coordinator. Henrikson failed to assign a second attorney to fill in for the second attorney on leave.

29. During the time that Clark was assigned to the Domestic Violence Calendar, she was over five months pregnant and it was increasingly difficult for her to manage the fast-paced demands of that calendar. Clark told Henrikson that handling the Domestic Violence Calendar alone, without the assistance of a second attorney, was causing complications in her pregnancy and seriously impacting her health. Nevertheless, Henrikson refused to assign a second attorney to the Domestic Violence Calendar, claiming that there was insufficient staff available. Instead, she allowed Clark to request assistance from other attorneys during their office days, but those attorneys were rarely able to assist her. Despite her claim that there was insufficient staff available, Henrikson approved a three-week training for two White attorneys during the same time that Plaintiff was serving on the Domestic Violence Calendar.

30. There came a time that two White attorneys asked Henrikson whether they could be assigned to this calender instead of Clark because of Clark's pregnancy, but Henrikson ignored their request.

31. Because Clark was the only attorney assigned to the Domestic Violence Calendar, she was almost always in court five days per week and handled on average four cases each day. By contrast, when two attorneys were assigned to the Domestic Violence Calendar, they were in court only four days per week and generally handled two cases per day.

32. Immediately after Ms. Clark went out on maternity leave and one of the White attorneys who had formerly worked on the calender returned, Henrikson assigned the Assistant Section Chief to be the permanent backup for the Domestic Violence calendar.

33. There were numerous occasions during which Henrikson required African-American attorneys to sign motions that they did not believe were legally supportable but afforded White attorneys the option of refusing to sign their name to a motion that they did not believe was legally supportable.

34. Henrikson has made numerous racially-hostile statements:

a. Henrikson has expressed to a number of White attorneys that she thinks some of the African-American attorneys possess no legal skills.

b. Henrikson openly referred to two African-American attorneys as "lazy" and stated that she would like to fire them but it is too hard because they are permanent employees.

c. Henrikson constantly belittled and demeaned the African-American support staff.

d. Henrikson has been heard in meetings mimicking some of the individuals whom the office represents (mostly African-American women) by repeatedly using the phrase "Who my baby daddy, " and "baby mama."

35. Henrikson has denied training to African-American attorneys and support staff which has been afforded to White attorneys.

36. In October of 2004, most of the attorneys in the office, both White and African-American, met with the then-Deputy Chief of Staff of the Office, Mr. Michael Hailey to voice their concerns about Henrikson's policies and practices, including the fact that there was clear

disparate treatment between the White and African-American attorneys in the Section. Notwithstanding Mr. Hailey's claim that the matter would be thoroughly investigated and that action would be taken, Henrikson continued in her discriminatory practices. Upon information and belief, the Defendant took no remedial action in response to these complaints.

37.     Following the October 2004 meeting, both Plaintiffs filed internal charges of discrimination with the Defendant's EEO offices. After six months, no resolution or findings had been reached.

38.     Angela Harvey, the Chair of the Officers' Diversity Committee who was investigating the Plaintiffs' claims, was removed from her position by Robert Spagnoletti, the Attorney General of the District of Columbia, shortly before she completed her investigation. Upon information and belief, Mr. Spagnoletti's decision to remove Ms. Harvey was motivated in whole or in part by his knowledge that she was going to make a finding against the Agency.

39.     About two weeks after the October meeting, all of the attorneys in the office were given Individual Accountability Plans ("IAP") by Henrikson. As part of Ms. Clark's IAP, Henrikson required her to conduct an independent survey of child support cases in D.C. and to write a memorandum on client advocacy law throughout the country. In contrast, all other attorneys were only required to write a memorandum of law and further they were permitted to write on the subject of their choice.

40.     Following the October meeting, Henrikson intensified her monitoring of Plaintiff Clark's work habits. She walked by Plaintiff's office a dozen or more times per day and she often stopped outside Plaintiff's office to watch Plaintiff's activities and listening to Plaintiff's telephone conversations from outside Plaintiff's office.

41.     In July of 2005, Ms. Clark asked Henrikson for an increase in her grade based on her job performance and time with the Agency.  Within about 24 hours of her request, Clark received a memorandum from Pamela Satterfield, the Chief of Staff to Robert Spagnoletti, stating that her contract would not be renewed.  Clark had never been counseled or warned that her performance was unsatisfactory.  Moreover, on information and belief, virtually all attorneys terms are renewed absent significant performance issues.  Ms. Clark did not suffer from performance issues.

42.     On information and belief, Mr. Spagnoletti blocked Ms. Clark's effort to obtain an appointment to a different D.C. Government Agency after she learned that her term appointment was not going to be renewed.

43.     On September 25, 2005, Ms. Clark received a letter from Robert Spagnoletti transferring her from Legal Services to the Civil Litigation Division.  Thus, Mr. Spagnoletti reversed the decision not to renew her appointment.

44.     The position into which Spagnoletti transferred Clark requires substantially more effort and time than did Clark's previous position, often requiring that she work twelve-hour days.  Furthermore, upon information and belief the Defendant was aware that Plaintiff did not desire to work in the field of general litigation.  In addition, Ms. Clark was given a term appointment instead of a permanent appointment.  Upon information and belief, no other attorney in the Civil Litigation Division had a term appointment except for one other attorney, who also had a pending discrimination case.

45.     In his letter to Plaintiff, Spagnoletti chastised Plaintiff for her actions and conduct during the prior year.  Mr. Spagnoletti was not Clark's supervisor and he had never supervised

her work.  Upon information and belief, Mr. Spagnoletti's reference to Ms. Clark's actions and conduct in his letter to her was a reference to her complaint of discrimination.

46. On or about August 21, 2006, the Defendant terminated Plaintiff Clark's employment effective October 7, 2006, by failing to renew her appointment.  The Defendant stated that the non-renewal was caused by fiscal concerns.  However, that reason is pretext.  In fact, upon information and belief the department is presently under-staffed and the department is seeking to hire additional staff.

47. As a result of the aforementioned conduct, Plaintiffs have suffered and continue to suffer lost wages and benefits and severe stress and anxiety, emotional pain and anguish, humiliation, and embarrassment, all of which have had and continue to have a negative overall impact on their personal, family, and professional life as well as their physical and emotional well being.

48. Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged, and are now suffering, and will continue to suffer irreparable injury from Defendant's treatment unless Defendant is enjoined by this Court.

# COUNT ONE

### Racial Discrimination in Violation of Title VII
### of the Civil Rights Act of 1964 as amended
### and the Civil Rights Act of 1991

49. Plaintiffs repeat and reiterate each and every allegation of Paragraphs 1 through 48 of this Complaint as if specifically alleged herein.

50. Through the above-described acts and conduct, Defendant has discriminated against Plaintiffs on the basis of their race (African-American) in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

51. Defendant engaged in the above-described discriminatory acts and conduct against Plaintiffs with malice and/or reckless indifference toward Plaintiffs' rights under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

WHEREFORE, Plaintiffs pray that this Court:

a. Declare Defendant's conduct to be in violation of Plaintiffs' civil rights;

b. Enjoin Defendant from engaging in such conduct;

c. Award Plaintiffs appropriate compensatory damages;

d. Award Plaintiffs back pay and benefits;

f. Award Plaintiffs their costs and attorneys' fees; and

g. Award Plaintiffs such other and further relief as may be deemed just and proper.

## COUNT TWO

### Racial Discrimination Hostile Environment in Violation of Title VII of the Civil Rights Act of 1964 as amended and the Civil Rights Act of 1991

52.　Plaintiffs repeat and reiterate each and every allegation of Paragraphs 1 through 51 of this Complaint as if specifically alleged herein.

53.　Through the above-described acts and conduct, Defendant has created and environment hostile to Plaintiffs on the basis of their race (African-American) in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

54.　Defendant engaged in the above-described discriminatory acts and conduct against Plaintiffs with malice and/or reckless indifference toward Plaintiffs' rights under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

WHEREFORE, Plaintiff prays that this Court:

a.　Declare Defendant's conduct to be in violation of Plaintiffs' civil rights;

b.　Enjoin Defendant from engaging in such conduct;

c.　Award Plaintiffs appropriate compensatory damages;

d.　Award Plaintiffs back pay and benefits;

f.　Award Plaintiffs their costs and attorneys' fees; and

g.　Award Plaintiffs such other and further relief as may be deemed just and proper.

# COUNT THREE

## Retaliation in Violation of Title VII
## of the Civil Rights Act of 1964 as amended
## and the Civil Rights Act of 1991

55. Plaintiffs repeat and reiterate each and every allegation of Paragraphs 1 through 54 of this Complaint as if specifically alleged herein.

56. Through the above-described acts and conduct, Defendant has retaliated against Plaintiffs in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

57. Defendant engaged in the above-described retaliatory acts and conduct against Plaintiffs with malice and/or reckless indifference toward Plaintiffs' rights under Title VII of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991.

WHEREFORE, Plaintiffs prays that this Court:

a. Declare Defendant's conduct to be in violation of Plaintiffs' civil rights;

b. Enjoin Defendant from engaging in such conduct;

c. Award Plaintiffs appropriate compensatory damages;

d. Award Plaintiffs back pay and benefits;

f. Award Plaintiffs their costs and attorneys' fees; and

g. Award Plaintiffs such other and further relief as may be deemed just and proper.

## COUNT FOUR

### Intentional Infliction of Emotional Distress

58. Plaintiffs repeat and reiterate each and every allegation of Paragraphs 1 through 57 of this Complaint as if specifically alleged herein.

59. Defendant's actions towards Plaintiffs, when viewed in the totality of the circumstances and particularly in view of Plaintiff Clark's pregnancy and Plaintiff Govan's fragile physical health and Defendant's notice thereof, constitute extreme and outrageous conduct.

60. Defendant acted in reckless disregard of the consequences.

61. As a direct and proximate cause of the aforementioned extreme and outrageous conduct, Plaintiff Clark has suffered severe stress and anxiety, emotional pain and anguish, humiliation, and embarrassment, all of which has had a negative overall impact on her mental health. Plaintiff suffers and continue to suffer from depression and other psychological symptoms which created tensions and unhappiness as well as a loss of enjoyment in her personal, family, and professional life. Defendant's conduct also caused Plaintiff physical symptoms, including sleeplessness, feelings of panic, hives, chest pains, and weight gain. Plaintiff also has been under frequent doctor's care.

62. As a direct and proximate cause of the aforementioned extreme and outrageous conduct, Plaintiff Govan has suffered severe stress and anxiety, emotional pain and anguish, humiliation, and embarrassment, all of which has had a negative overall impact on her mental health. Plaintiff suffers and continue to suffer from depression and other psychological symptoms which created tensions and unhappiness as well as a loss of enjoyment in her personal,

family, and professional life.  Defendant's conduct also caused Plaintiff physical symptoms, including migraine headaches, weight gain, dizziness, panic attacks, trembling, and sleeplessness.  Plaintiff also has been under frequent doctor's care.

WHEREFORE, Plaintiffs pray that this Court:

a. Award each compensatory damages against Defendant in the amount of one million dollars ($1,000,000.00);

b. Award Plaintiffs any and all further relief which this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, by and through their under-signed counsel, herewith demand a trial by jury on all issues.

Respectfully submitted,

/s/
Richard Semsker, Bar #413886
S. Micah Salb, Bar #453197
LIPPMAN, SEMSKER & SALB, LLC
7700 Old Georgetown Road
Suite 500
Bethesda, Maryland 20814
(301) 656-6095

Attorneys for Plaintiffs